**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| Kate Adams as Parent and Natural Guardian of E.A., minor, Alysa Barnes, Breanna Bullis, Hannah Combs, Emily Courtney, Aubree Davis, Emily DuPuis, Joanna Flood, Emma Frederick, Azarriah Gibson, Eliana Greenfield, Sukanya Harbin, Christine Hong, Estella Jackson, Isabella Jacquez, Makayla Launius, Madeline Lewis, **Adriana Link**, Caitlyn Maguire, Autumn Mays, **Creed Melton**, Haven Murdock, Madison Music, **Emily Nelson**, Kirah Oswald, Kaysie Peyton, Brooke Pietrouski, Isabella Poche, Roxanne Porras, **Lauren Sanders,** Hannah Scragg, Delia Simon, Rachel Simonick, Sarah Taylor, Chelsie Turlich, Hannah Weal, Laura Whitehouse, Kristin Williams, and Breanna Wombaker, | ) | **Civil Case No.: 1:26-cv-00700-MPB-MKK** |
| *Plaintiffs,* | ) | **JURY TRIAL DEMAND** |
| v. | ) | |
| Indiana Teen Challenge, Inc. formerly d/b/a Central Indiana Teen Challenge, now d/b/a The Refuge Girls Academy, Dave Rose, Dawn Rose and Missy Bowman, | ) | |
| *Defendants.* | ) | |

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES**

Come now Plaintiffs, Kate Adams as Parent and Natural Guardian of E.A., a minor, Alysa Barnes, Breanna Bullis, Hannah Combs, Emily Courtney, Aubree Davis, Emily DuPuis, Joanna Flood, Emma Frederick, Azarriah Gibson, Eliana Greenfield, Sukanya Harbin, Christine

Hong, Estella Jackson, Isabella Jacquez, Makayla Launius, Madeline Lewis, **Adriana Link**[1], Kaitlyn Maguire, Autumn Mays, **Creed Melton,** Haven Murdock, Madison Music, **Emily Nelson**, Kirah Oswald, Kaysie Peyton, Brooke Pietrouski, Isabella Poche, Roxanne Porras, **Lauren Sanders**, Hannah Scragg, Delia Simon, Rachel Simonick, Sarah Taylor, Chelsie Turlich, Hannah Weal, Laura Whitehouse, Kristin Williams, and Breanna Wombaker, by and through their counsel, COHENMALAD LLP. Plaintiffs submit this Amended Complaint pursuant to F.R.C.P. 15(a)(1)(B), its first amended pleading, as a matter of course and prior to Defendants filing any responsive pleading to the Complaint filed on April 8, 2026. They allege as follows:

## I. INTRODUCTION

1. This action arises from the systematic abuse, neglect, trafficking, exploitation and forced labor of the Plaintiffs while they were minors and residents at Indiana Teen Challenge, Inc. while doing business as Central Indiana Teen Challenge ("CITC"), and now operating as The Refuge Girls Academy, a facility purporting to provide faith-based "mentorship, personal development and character-building exercises" to so-called "troubled teens."

2. Plaintiffs were residents of CITC on the following dates:

a) Kate Adams obo E.A., a minor, from November 2021 to May 2022;
b) Alysa Barnes, 2016;
c) Breanna Bullis, from August 2016 to July 7, 2017;
d) Hannah Combs, 2014;
e) Emily Courtney, from Spring 2017 to Spring 2018;
f) Aubree Davis, from July 11, 2019 to July 30, 2020 and October 2020 to 2022;
g) Emily Dupuis*, from March 2013 to September 2013;
h) Joanna ("Jay") Flood, from 2018 to 2019;
i) Emma Frederick, from 2015 to 2017;

[1] **Plaintiffs added to this Second Amended Complaint are indicated in bold-faced type.**

j) Azarriah Gibson, from September 2025 to December 2025;

k) Eliana Greenfield*, from September 13, 2012 to September 18, 2014;

l) Sukanya Harbin, from November 2019 to March 17, 2021;

m) Christine Hong*, from April 17, 2018 to January 2019;

n) Estella Jackson, from 2018 to 2020;

o) Isabela Jacquez, from 2023 to 2024;

p) Madeline Lewis, May 13, 2022 to April 19, 2023;

q) Makayla Launius, from February 10, 2020 to June 3, 2021;

r) **Adriana Link,** from 2021 to 2022;

s) Caitlyn Maguire, June 2020;

t) Autumn Mays*, from March 2014 to October 18, 2015;

u) **Creed Melton**, from June 5, 2017 to November 23, 2017;

v) Haven Murdock*, from June 2011 to June 2014;

w) Madison Music, from February 14, 2017 to March 2018;

x) **Emily Nelson**, from March 28, 2023 to April 6, 2025;

y) Kirah Oswald*, from Spring of 2014 to Fall of 2014;

z) Kaysie Peyton, from 2019 to 2020;

aa) Brooke Pietrouski, from March 20, 2020 to August 28, 2020;

bb) Isabella Poche, from June 13, 2017 to August 2018;

cc) Roxanne Porras, from 2018 to 2020;

dd) **Lauren Sanders**, from March 2025 to September 2025;

ee) Hannah Scragg*, from July 22, 2013 to July 2014;

ff) Delia Simon, from Spring 2020 to Spring 2021;

gg) Rachel Simonick, 2016;

hh) Sarah Taylor, from October 2019 to July 2021;

ii) Chelsie Turlich*, from March 21, 2012 to December 23, 2012;

jj) Laura Whitehouse, from 2017 to 2018;

kk) Kristin Williams* from April 2012 to July 2012;

ll) Hannah Weal, from March 10, 2015 to August 2015; and

mm) Breanna Wombaker, from August 13, 2021 to August 13, 2022.

3. CITC is part of the larger Troubled Teen Industry ("TTI"), a notorious moniker that refers to the nationwide network of purported therapeutic programs that market to families of so-called "troubled teens," or teens who have used drugs or alcohol, disobey their parents and other authorities, or who purportedly struggle with myriad mental health issues and other disciplinary issues.

4. Like other TTI facilities, CITC recruited for and solicited for residents, including Plaintiffs, through sophisticated marketing and messaging that promised families that their children would receive safe and therapeutic care and education in a structured and nurturing environment.

5. The reality is that, from the moment they arrived at CITC, Plaintiffs and other residents were abused, neglected, humiliated, pitted against one another to earn privileges and avoid punishment, physically assaulted, spiritually coerced, given simplistic and largely meaningless "workbooks" in the guise of education, and forced to perform a variety of physically hard, dangerous, and even bizarre and cruel unpaid labor.

6. CITC did this through a systemic method of coercion and control over Plaintiffs and other residents, punishing them through discipline, isolation, humiliation, food and hygiene restrictions, and other measures to maintain Plaintiffs' compliance with CITC's bizarre, random and cruel demands.

7. Most egregiously, CITC told Plaintiffs and their families that the program and its many rules and restrictions were God's will for them, that their "illnesses" and perceived sinful acts were their own faults, and that they deserved whatever physical or emotional pain they felt.

8. CITC told Plaintiffs and their families that to question their conditions, or CITC's commands, or to fail to carry out each and every command was to question God, and that to question God would only worsen their conditions and extend their time at CITC.

9. Despite the fact that Teen Challenge operated facilities that were geographically closer to the Plaintiffs and other residents, CITC deliberately moved the girls far away from their homes to discourage visits from family and friends, and to reduce the risk that the resident and her family would leave the program or that the resident minor would run away.

10. CITC ultimately profited from the abuse and coerced forced labor of vulnerable children, including Plaintiffs, over the course of the months or years each Plaintiff resided at CITC, while their unsuspecting parents paid CITC thousands of dollars, and while many food pantries, churches and charitable organizations provided CITC with money, food and other in-kind donations for its operations.

11. By information and belief, universities and for-profit businesses paid CITC for the labor of its minor residents, including the Plaintiffs, with the expectation that the minors doing the labor would be paid. In fact, CITC kept these wages and the residents received nothing.

12. At no time did Defendants Dawn Rose, Dave Rose, Missy Bowman or other state or national-level Teen Challenge officials report the mistreatment, forced labor, abuse and neglect of the Plaintiffs to the proper state or local authorities.

13. By information and belief, CITC chose not to seek Indiana state licensure as a residential facility under any licensing scheme to avoid scrutiny and oversight of its facility, operations and "treatment" methods.

14. Local police departments received hundreds of emergency calls from CITC and its residents during the relevant periods of time described herein, for a myriad of crises at CITC. Many residents ran away, then immediately called the police for help.

15. By information and belief, during relevant times Indiana's Department of Child Services received numerous reports of abuse and neglect at CITC.

## II. THE PARTIES

16. Plaintiffs' states of residence are as follows:

a. Kate Adams obo E.A., a minor - Indiana;
b. Alysa Barnes - Kansas;
c. Breanna Bullis - Michigan;
d. Hannah Combs - Alabama;
e. Emily Courtney - Kentucky;
f. Aubree Davis – Michigan;
g. Emily Dupuis - Michigan;
h. Joanna Flood - Michigan;
i. Emma Frederick - Florida;
j. Azarriah Gibson – Michigan;
k. Eliana Greenfield – South Carolina;
l. Sukanya Harbin - Michigan;
m. Christine Hong - Ohio;
n. Estella Jackson - Wisconsin;
o. Isabela Jacquez - Texas;
p. Madeline Lewis - Florida;
q. Makayla Launius - Missouri;
r. **Adriana Link** – Indiana;
s. Caitlyn Maguire - Illinois;
t. Autumn Mays -Illinois;
u. **Creed Melton** – Indiana;
v. Haven Murdock - Wisconsin;
w. Madison Music - Michigan;
x. **Emily Nelson** – Indiana;
y. Kirah Oswald - Michigan;
z. Kaysie Peyton - Indiana;

aa. Brooke Pietrouski - Michigan;

bb. Isabella Poche - Tennessee;

cc. Roxanne Porras - Texas;

dd. **Lauren Sanders** – Indiana;

ee. Hannah Scragg - Ohio;

ff. Delia Simon - Indiana;

gg. Rachel Simonick - Florida;

hh. Sarah Taylor - Ohio;

ii. Chelsie Turlich - Illinois;

jj. Laura Whitehouse -Florida;

kk. Kristin Williams - Texas;

ll. Hannah Weal - Alabama; and

mm. Breanna Wombaker - Tennessee.

17. Plaintiffs who first entered CITC under the regime of Dawn Rose are as follows: Bullis, Barnes, Combs, Courtney, Dupuis, Flood, Frederick, Greenfield, Hong, Jackson, Mays, **Melton**, Murdock, Music, Oswald, Poche, Porras, Scragg, Simonick, Turlich, Weal, Whitehouse and Williams.

18. Plaintiffs who first entered CITC under the regime of Missy Bowman are as follows: E.A., Davis, Gibson, Harbin, Jacquez, Launius, Lewis, **Link**, Maguire, **Nelson**, Peyton, Pietrouski, **Sanders,** Simon, Taylor and Wombaker.

19. Plaintiffs Kate Adams, obo E.A., Azarriah Gibson and Madeline Lewis have also asserted supplemental claims under Indiana state law, including negligence/gross negligence, civil liability/respondeat superior, battery, assault, false imprisonment, and intentional infliction of emotional distress – Counts V – X respectively.

20. Defendant Central Indiana Teen Challenge – which by information and belief is currently doing business as The Refuge Girls Academy – has been at all relevant times, a

501(c)(3) non-profit, organized under the laws of Indiana with its principal place of business at 1015 N. Lebanon Street, Lebanon, Indiana, 46052.

21. By information and belief, Defendant Central Indiana Teen Challenge is currently incorporated under the name Greater Lafayette Adult and Teen Challenge; at prior relevant times CITC was part of the entity incorporated as Indiana Teen Challenge, Inc.

22. By information and belief, Defendant Dave Rose was at all relevant times the CEO of Indiana Adult & Teen Challenge, Inc. and was also regularly involved in the supervision and management of CITC and its residents. By information and belief, Defendant Dave Rose resides in Lebanon, Boone County, Indiana.

23. By information and belief, Defendant Dawn Rose was at all relevant times between 2011 and 2019 the Director of Central Indiana Teen Challenge, and she continued to work at CITC either as paid staff or as a volunteer after her tenure as Director ended. By information and belief, she resides in Lebanon, Boone County, Indiana.

24. By information and belief, Defendant Missy Bowman was at all relevant times an employee of CITC and became Director of CITC in the summer of 2019. Her tenure as Director is believed to have ended in approximately April 2026. By information and belief she resides in Lebanon, Boone County, Indiana.

## III. JURISDICTION AND VENUE

25. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves claims arising from a federal question under 18 U.S.C. §§ 1589, 1590, 1594, 1595(a), and 2255.

26. This court has supplemental jurisdiction over the state claims raised in this Amended Complaint, pursuant to 28 U.S.C. § 1367, on the grounds the state claims are closely related to the federal claims and arise from the same sets of facts as the federal claims herein.

27. This Court has general and specific jurisdiction over CITC because its principal place of business is in Indiana and because the claims in this matter arise out of these Defendants' contacts within Indiana.

28. This Court has specific jurisdiction over the claims of all Plaintiffs because their injuries arose from conduct that occurred at CITC in Indiana and their claims directly relate to Indiana-based conduct.

29. Venue is proper in this Court pursuant to 18 U.S.C. § 1391(b) because a substantial part of the events giving rise to the alleged claims occurred within this judicial district.

## IV. TIMELINESS OF COMPLAINT

30. All Plaintiffs have brought this suit within ten of years of their 18th birthday and their claims are therefore timely, pursuant to 18 U.S. § 1595(c)(2), with the exception of the following Plaintiffs: Combs, DuPuis, Greenfield, Mays, Oswald, Scragg, Turlich and Williams.

31. As for the eight Plaintiffs listed in the paragraph above, this Complaint is timely filed pursuant to an amendment 18 U.S.C. § 2255, entitled the Eliminating Limits to Justice for Child Sex Abuse Victims Act of 2022 (ELTJA), which went into effect on September 16, 2022, and which eliminates the statute of limitations for the filing of a civil claim for any person who, while a minor, was a victim of a violation of – inter alia – 18 U.S.C. §§ 1589 (forced labor) and 1590 (trafficking for the purpose of, inter alia, forced labor). All plaintiffs were minors at the time of the federal claims described herein, and none of their claims were time-barred as of the date the ELTJA went into effect. The ELTJA abrogated the 10-year statute of limitations set forth in 18 U.S.C. § 1595(c). Therefore, each Plaintiff's claims herein are all timely.

32. In the alternative, any other statute of limitations applicable to any of the Plaintiffs, including arguably 18 U.S.C. § 1595(c)(2), is tolled by the "discovery rule" which

allows for additional time as the Plaintiffs discovered they had been the victims of actionable abuse.

33. In the alternative, any other statute of limitations applicable to any of the Plaintiffs is tolled by the doctrine of equitable tolling of their federal claims.

34. The “discovery rule” and the doctrine of equitable tolling are both applicable on the grounds that:

a. CITC used extreme and coercive measures to convince Plaintiffs and their families that Plaintiffs’ experiences at CITC were all part of God’s plan and necessary for Plaintiffs to heal.

b. CITC presented its services as divinely inspired and guided.

c. Plaintiffs and their families were devoutly religious and believed in CITC’s tactics because CITC framed it all as God’s will.

d. Plaintiffs did not discover until very recently that CITC’s treatment of them was not divinely inspired and that it was, in fact, abuse and neglect. Until this discovery, Plaintiffs firmly believed that their time at CITC was, in fact, God’s will and that they were solely to blame for their injuries and damages after they left CITC because it was their fault for not being connected to God. Plaintiffs believed this tenet because it is exactly what CITC taught and instilled in them for many months while they were vulnerable and struggling children.

35. Plaintiffs Kate Adams obo E.A., Azarriah Gibson and Madeline Lewis have brought supplemental claims herein under Indiana state law; all were minors while residing at CITC and have timely filed this suit within two years of their 18th birthdays. [2]

[2] All Plaintiffs’ dates of birth will be provided to defense counsel.

## V. STATEMENT OF FACTS

### A. Teen Challenge is a Missionary Branch of Assemblies of God

36. CITC is part of the broader national organization, Adult & Teen Challenge USA.

37. Teen Challenge USA is a Christian-centered network of addiction and mental health resources that includes residential facilities such as CITC.

38. There are hundreds of Adult & Teen Challenge USA residential facilities in the United States.

39. Teen Challenge USA is a missionary department of the Assemblies of God U.S. Missions.

40. Assemblies of God pastor David Wilkerson founded Teen Challenge USA in approximately 1958 and opened his first residential facility in 1962.

41. Teen Challenge USA has had several licensed Assemblies of God ministers on its board of directors.

42. Defendant Dave Rose is by information and belief an ordained minister in the Assembly of God organization in the State of Indiana.

43. Defendant Dave Rose has been at all relevant times the State Director of the Indiana Adult and Teen Challenge Centers, whose responsibilities included the supervision and oversight of all Teen Challenge facilities in Indiana, including CITC.

44. Assemblies of God, through its ministers, employees, and volunteers, has a reportedly long history of abusing children and covering up the abuse.

45. In an ongoing series titled "Pastors and Prey," NBC News has detailed chronic and rampant abuse by Assemblies of God employees, ministers, and leaders. By information and belief the first segment of the series was published in May of 2025.

46. The Pastors and Prey documentary series details a history of abuse dating back to at least the 1970s of Assemblies of God ministers being allowed to continue to lead youth groups after substantiated reports of the ministers' abuse of minors.

47. NBC News reported in its Pastors and Prey series that nearly 200 Assemblies of God pastors, church employees, and volunteer leaders have been accused of abuse over the last fifty years. The abuse involved more than 475 victims, with the overwhelming majority of those victims being children.

48. NBC News reported in its Pastors and Prey series that abusive Assemblies of God ministers coerce victims using scripture to warn the victims never to question spiritual leaders. Defendants provided these same warnings and threats to the Plaintiffs.

49. NBC News reported in its Pastors and Prey series that national Assemblies of God leaders have resisted implementing rules to protect against the abuse of minors because the rules could create legal liability for the organization.

50. Richard Hammar, who by information and belief for more than 40 years served as the Assemblies of God's general counsel, is quoted in the Pastors and Prey series as saying the legal risks of implementing such rules "outweighed the benefit."

51. CITC attempts to indoctrinate its residents with Assemblies of God religious doctrines.

52. The Assemblies of God doctrine is "woven through every aspect of a student's experience" at Teen Challenge academies, including those of the Plaintiffs.

53. The Assemblies of God generally, and CITC specifically, utilize a program called "Stay Sharp," which is billed as a "hard-hitting, straight talk, drug preventing presentation … through a relationship with Christ." For the Plaintiffs and other residents, the Stay Sharp program entailed the hard emotional labor of providing forced testimonials in front of church

audiences large and small in order to solicit funds and other donations for the Defendants. Most Plaintiffs were brought by van to churches of every size throughout Indiana to do so. The testimonials were expected to sound heartfelt, to include intimate details of every "sin" the girls had committed that supposedly brought them to CITC, and even to embellish and exaggerate if their true stories were not compelling enough. Failure to do so resulted in various punishments.

54. Methods of punishment, abuse and coercion are remarkably uniform at Teen Challenge facilities throughout the U.S., including but not limited to isolation, "talking fasts," forced labor, forced church testimony and meaningless repetitive tasks with no therapeutic or educational benefit.

55. During their Stay Sharp testimonial work and other church visits and work duties, Plaintiffs and other residents were forbidden from speaking to congregants and were forbidden from making eye contact with boys or men during these church outings.

56. Any time Plaintiffs and residents spoke with or interacted with an adult male they were accused of being sexually promiscuous and punished. As an example, when the mailman drove up to the car wash on his motorcycle and the girls said hello, Missy Bowman reported to Caitlyn Maguire's mom that Caitlyn had thrown herself at a grown man. Caitlyn was also accused of having a sexual relationship with a local retired police officer who had shown kindness to her and other residents.

## B. CITC Falsely Promised a Safe and Therapeutic Environment for Plaintiffs

57. CITC and Teen Challenge USA represented to Plaintiffs and their families that CITC would be a safe and therapeutic environment in which Plaintiffs could heal.

58. Many of the Plaintiffs and other residents come from devoutly religious families, and they themselves were devoutly religious when they arrived at CITC. Others were less so and

were confused and frightened by the teachings and punishments that they were taught are biblical or part of "God's plan" for them.

59. CITC represented itself at all times to Plaintiffs and their families as a Christian organization.

60. Plaintiffs' families, in turn, chose CITC and continued their daughters' enrollment at CITC for months and even years at least in part because it held itself out as a Christian organization.

61. Teen Challenge USA and CITC promotes its programs as an affordable exception to traditional boarding schools because Teen Challenge USA and CITC used "faith-based focus to bring about life transformation."

62. Teen Challenge USA and CITC promised to provide purportedly "troubled teens," or teens struggling with mental health issues, like many of the Plaintiffs, with the help they and/or their parents believed they needed but falsely promised that the teens would receive care from licensed physicians, psychologists and other mental health professionals.

63. Teen Challenge USA and CITC specifically marketed their program as "tailored to teens struggling with behavioral, motivational, or academic challenges" and that its facilities provided "24/7 mentorship and care" to residents, like Plaintiffs.

64. CITC made representations similar to those of Teen Challenge USA to Plaintiffs and their families.

65. CITC markets itself as a "uniquely transformative" facility that will "lead students towards wholeness."

66. CITC markets itself as having trauma-informed staff that "respond with grace, boundaries, and wisdom" to residents.

67. CITC, like Teen Challenge USA, specifically markets to girls and their families who are uniquely vulnerable and susceptible to coercion and abuse.

68. CITC markets itself as having "great success" helping girls with a myriad of psychological, psychiatric, and social issues, specifically stating it helps teens with negative self-image, a history of self-harm, who are struggling with drugs, alcohol or other severe psychological disorders, and who have experienced profound trauma, such as abusive parents or rape.

69. CITC markets to families with adopted children, which resulted in a statistically outsized percentage of residents with adoptive parents, who in many cases believed they could not understand or cope with teens who were not their biological offspring.

70. Plaintiffs and their families relied on CITC and Teen Challenge USA's representations when choosing to enroll, and later in choosing to continue remaining at CITC for months or years until CITC deemed the Plaintiffs had "graduated" and could leave.

71. The Defendants expressly promised Plaintiffs' families that CITC would treat Plaintiffs' specific conditions and address the parents' specific concerns.

72. The Defendants expressly promised Plaintiffs' and their families that residents receive a high school education at CITC.

## C. CITC Was a Methodically Abusive, Coercive and Isolating Environment

73. The descriptions herein of abusive, coercive, nontherapeutic, isolating, manipulative and bizarre treatment the Plaintiffs received while at CITC are not intended to be all-inclusive, and Plaintiffs specifically reserve the right to provide additional information during the discovery of this litigation and in accordance with the court's deadline for Plaintiffs' Statement of Claims.

74. For some of the Plaintiffs and other residents, the psychological and physical abuse of the Plaintiffs began even before they arrived at CITC; as an example, most of the Plaintiffs during Dawn Rose's regime were required to undergo an invasive and wholly unnecessary gynecological examination that included a PAP smear, even though they were as young as thirteen when they arrived at CITC. One Plaintiff suffered from severe pain and bleeding from this painful examination.[3] Another Plaintiff's mother could not find a local physician willing to subject a young teen to this invasive examination. Defendants Dawn Rose and/or others at CITC advised Plaintiffs' parents that this painful internal examination was necessary to rule out pregnancy or sexually transmitted diseases. In fact, an internal pelvic exam and PAP smear are not medically necessary for these diagnoses.

75. Some residents, including Plaintiff Makayla Launius, were taken to CITC by surprise, and by force, when men they did not know came into their homes – with parental permission – physically restrained and removed them from their homes, placed them in a vehicle, and drove them out-of-state to CITC. Makayla was not only taken by surprise from her bedroom in the middle of the night, but she was forced to wear weighted shoes and a leash while being transported by these strangers from her home in Missouri to CITC in central Indiana.

76. No matter whether the Plaintiffs and other residents arrived by force or cooperated in being driven to CITC by family members, every Plaintiff upon her arrival was subjected to a humiliating strip search, which in almost all cases included squatting and an inspection of her naked body by staff members and sometimes also by a student "mentor."

77. CITC cut off all direct contact between Plaintiffs and their families for their first month at CITC, and sometimes for longer periods of time, and strictly limited and censored

[3] The identities of the Plaintiffs who were forced to undergo PAP smears will be provided to defense counsel.

Plaintiffs' handwritten letters. In-coming letters were often confiscated, read, then not passed along to the Plaintiffs, who had no access to cell phones or computers in which to exchange emails or messages. Even during family emergencies, CITC staff often refused to allow family members to speak with loved ones. For example, Breanna Wombaker was given a punishment so that she could not attend her grandmother's funeral.

78. CITC staff screened all outgoing letters and would force residents, including Plaintiffs, to re-write letters that mentioned anything negative about CITC.

79. Once Plaintiffs earned the privilege of calling their families, CITC staff listened to all calls and would pause or end calls if Plaintiffs mentioned anything negative about CITC.

80. As a condition of admitting Plaintiffs, CITC required Plaintiffs' parents to give CITC exclusive and unconditional control and custody of Plaintiffs for the entire time Plaintiffs were at CITC.

81. As a condition of admitting Plaintiffs, CITC required Plaintiffs' parents to promise not to interfere with CITC's custody or management of Plaintiffs while Plaintiffs were at CITC.

82. CITC's immediate and paramount concern for new residents was to gain control of the residents and to begin the foundational practice of forcing residents into compliance with coercion and punishment.

83. CITC controlled residents, including Plaintiffs, through religious coercion, and emotional, psychological, and physical abuse. They were repeatedly and publicly shamed for their perceived "sins."

84. CITC preemptively told parents of Plaintiffs and other residents during the admissions process to anticipate that their daughters would be lying if they ever mentioned anything negative about CITC, and to ignore their daughter's pleas to leave. Parents were told

that negative comments were merely manipulative and demonstrated the child's need for prolonged treatment at CITC.

85. Upon information and belief, CITC knew its structure and practices could worsen Plaintiffs' conditions and that its promises were almost entirely false.

86. Discipline and consequences are the centerpiece of an environment at CITC in which vulnerable children are psychologically broken down in order to force their compliance starting the moment they arrived.

87. CITC immediately strips all new residents of all their rights and personal necessities upon their arrival.

88. CITC refers to basic human rights and necessities as privileges. These "privileges" include speaking, using the bathroom, showering, eating, having access to hygiene products, communicating with family, and sleeping.

89. CITC removed "privileges" as punishment. CITC also moved children back down in the level system as punishment for even the slightest infractions or perceived infractions.

90. Plaintiffs lost access to personal belongings, hygiene products, and human contact, sometimes for days or weeks at a time, sometimes for minor infractions or based on false reporting by staff or other residents.

91. The only way to avoid punishments was complete and unquestioning compliance with CITC's draconian commands and rules.

92. CITC tied all privileges to a level system, wherein privileges were "earned" as residents progressed up through levels beginning at Entry Level and moving up through Levels 1 through 4.

93. At Entry Level, Plaintiffs and other CITC residents were immediately prohibited from speaking to anyone but their "mentors" (watchers) who were with them every hour of the day. This was referred to as a "Talking Fast."

94. CITC would add on time to a resident's Talking Fast designation for even the slightest disciplinary infraction, or for speaking out of turn. Some residents were on Talking Fast for months at a time. As an example, Plaintiff Sukanya Harbin was forbidden from talking during a Talking Fast which lasted for nine months. During these periods of time the Plaintiffs and other residents would be required to wear whiteboards around their necks to write any message necessary to communicate basic needs. Residents, including Plaintiff Haven Murdock, were required to wear these humiliating boards around their necks even while performing labor at churches.

95. CITC forbade Plaintiffs and other residents from making eye contact with anyone without permission or from moving or going anywhere without their watchers.

96. Plaintiffs and other residents could not use the bathroom or shower without staff or their watchers personally observing them.

97. CITC regularly used physical punishment and the threat of physical punishment to force compliance with its rules.

98. CITC mandated Plaintiffs' and other residents' compliance with rules. Physical punishment included but was not limited to military-style physical exercise routines, sometimes in extreme heat, and running down a country road for many miles with a CITC van following closely behind, with no relief, even after vomiting and other signs of heat distress. CITC staff inside the van would mock, tease or shame the girls while they were running and struggling to keep up.

99. Plaintiff Hannah Scragg was forced to work out in extreme heat – one of CITC's favorite forms of punishment - even after she had vomited so extensively that she was bringing up bile. Plaintiff Chelsea Turlich was forced to run in the heat with no water breaks for hours at a time. Plaintiff **Creed Melton** was also forced to run in extreme heat, and to keep running even after she vomited. One girl – whose name is known to Defendants but not yet to Plaintiffs - was forced to run while wearing a backpack with approximately sixty pounds of canned food, to symbolize how she had "brought the house down" with her bad behavior. This resident was required to wear that backpack all day - except while sleeping - for approximately one month.

100. Plaintiff Emily Courtney was physically assaulted by Defendant Dawn Rose on a number of occasions, including one where Rose dragged Emily up a set of stairs by her arm.

101. CITC punished Plaintiffs and other girls for "condoning." Condoning is a term used at many Teen Challenge facilities where a resident has ostensibly observed another girl break a CITC rule but has not reported the infraction to staff. Condoning is forbidden and doing so results in punishments as described herein.

102. Condoning led to girls lying to CITC staff about infractions to curry favor with staff and to avoid punishment.

103. Condoning created a hostile and untrusting environment that was not therapeutic or healthy for Plaintiffs and other residents.

104. CITC created a hostile environment in which Plaintiffs and other residents could be forced to stay at CITC longer, and their parents to pay more tuition, if other residents retaliated against them and lied to staff as part of Condoning.

105. Other residents lied to CITC staff about some of the Plaintiffs as part of Condoning, and CITC punished these Plaintiffs as a result.

106. CITC's rules and restrictions changed daily, sometimes hourly, often arbitrarily, and the staff enforced them randomly and with favoritism.

107. Upon information and belief, no licensed clinical therapists, psychologists or social workers were hired by or contracted with to provide proper therapeutic care to most of the Plaintiffs while at CITC. A few of the Plaintiffs were given brief access to licensed therapists, but the therapists were dismissed or quit after only a short period of time when they raised concerns about CITC's methods.

108. The Defendants did not tailor medical care, treatment plans or educational experiences to the individual residents to address their specific needs and challenges. Instead, every resident, including each Plaintiff, was treated with the same or similar cruel, unnecessary, and bizarre forms of "care."

109. CITC punished residents, including Plaintiffs, whenever they spoke negatively about CITC on calls with their families. Punishments, as described above, included "talking fasts," isolation, and ordering the girls to write many multiple copies of long passages of text from various sources, including the Bible and the Teen Challenge student manual. Any error in their copying, however minor, resulted in being forced to start all over again. This and other similar punishments had no therapeutic or educational purpose, and in fact wasted many hours of time that could have been spent engaged in legitimate educational pursuits.

110. Residents were punished for actions they did not know were forbidden. As an example, Caitlyn Maguire was put on restriction for more than a month for cutting her hair without permission. During this time all her belongings were taken away except a Bible, one "restriction uniform" a blanket and a pillow. Plaintiff **Adriana Link** entered CITC with a pixie-style haircut but was told it was improper and was forced to grow it long.

111. CITC restricted residents' ability to talk honestly with their families in order to keep residents enrolled and working and to keep tuition payments flowing. Instead, Plaintiffs and other residents were instructed to say only positive things about CITC during their phone calls, in their letters and during in-person visits with family. Failure to follow this rule, or to alert parents of dangerous or upsetting conditions, resulted in punishments described above.

112. CITC would not allow Plaintiffs and other residents any contact with their friends, school-mates, church mates or boyfriends, and instead would try to convince them that these individuals were merely part of their old, sinful life who should be shunned and left behind.

113. Some of the Plaintiffs and their families were told by Dawn Rose or Missy Bowman that CITC offered regular access to stables for horseback riding. It was this promise that inspired some of the Plaintiffs to cooperate in attending CITC and indeed to look forward to the experience. This promise was entirely illusory and the lie particularly cruel to girls who went there voluntarily, comforted by the promise of riding horses. The closest the Plaintiffs came to horseback riding was that some of them, including Delia Simon, **Lauren Sanders** and Joanna Flood, were made to muck out horse stalls at a nearby equine therapy facility, without pay, but were never allowed to ride a horse.

114. It was CITC's practice to put every resident into isolation upon her arrival at CITC. Plaintiffs and other residents were isolated in the "safe room" or the "prayer room" not just when they first arrived, but repeatedly. For other Plaintiffs "isolation" meant confinement alone in their bedrooms, which were armed with door alarms, while a mentor stood guard and slept outside the room on a mattress.

115. The Plaintiffs and other residents spent various periods of time in isolation, a common type of punishment for infractions. Isolation could last for indeterminate periods of

time, sometimes as long as thirty days. While in isolation the resident saw no one except her mentor, spoke to no one, and was offered few if any comforts.

116. While in isolation Plaintiffs and other residents were sometimes deprived of access to an adjacent locked restroom for many hours at a time. However, the "safe room" had a sink. There were occasions where Plaintiffs attempted to alert staff that they desperately needed to use the bathroom by pounding on the hall door and/or waving at the surveillance cameras. When their pleas were ignored these girls would sit on and urinate into the sink.

117. When placed in isolation the Plaintiffs had no bed or cot, and no bedding, including blanket or pillow. They were forced to sleep directly on the floor. The room contained no reading material and nothing for the girls to do to occupy their time. They were expected to sit in quiet "reflection" for hours, days, or sometimes weeks at a time with no human interaction except for the delivery of the same meal every day – a peanut butter and jelly sandwich and a glass of milk. In other words, isolation was akin to solitary confinement in a jail or prison. Plaintiff Chelsie Turlich was once put in the "safe room" alone for three weeks.

118. Plaintiff Madison Music was disciplined because she was accused of trying to run away merely for wearing several layers of clothes when the house was particularly cold.

119. The only way for Plaintiffs and other residents to gain privileges and to sustain upward movement through the levels – with hopes of more freedom and eventual "graduation" – was complete obedience to CITC's arbitrary and draconian commands and rules.

120. CITC required students to complete all levels before they could "graduate," or before CITC would recommend to families that it was time for their children to leave CITC.

121. Plaintiffs and other residents believed their complete obedience and compliance with CITC's rules, restrictions and requirements was the only way for them to ever leave CITC.

122. The only alternative that some of the Plaintiffs and other residents believed they had for ending the abuse was to run away or attempt suicide, sometimes for the express purpose of getting arrested, in order to be taken to a juvenile detention center or a mental hospital, which they believed was safer and less restrictive than CITC. For example, Plaintiffs Hannah Weal and Kristin Williams tried to run away, while Plaintiffs Kasie Peyton, Brooke Pietrouski, Hannah Scragg, **Emily Nelson** and Delia Simon all attempted to harm themselves so they would be taken to hospital for treatment by licensed mental health professionals. Many of the residents who attempted suicide or made repeated suicide gestures were denied medical or psychological care to treat or address these episodes. By information and belief, it was not the practice of CITC to notify parents of their child's suicide attempts, including the parents of **Emily Nelson**.

123. Defendants Dawn Rose, Missy Bowman and their staff handed out punishments to Plaintiffs and other residents, including the removal of "privileges," isolation, talking fasts and other restrictions, even when they knew that an accusation of misbehavior was untrue. Residents were sometimes placed in isolation for extended periods of time, including Plaintiff Haven Murdock, who was forced into isolation for a month.

124. Plaintiff Brooke Pietrouski lost her clothing privileges and was forced to wear a trash bag. Other residents, including Plaintiff Laura Whitehouse, were punished with outings that Dawn Rose termed "freeze outs." These were outings where the girls were required to travel in the CITC van in the bitter cold of winter, with the windows down, without coats or hats, in order to experience the "treat" of getting ice cream.

125. Plaintiff Hannah Scragg was physically assaulted by Defendant Dawn Rose on a number of occasions, including shoving her and grabbing her hard by her arm. On one occasion Hannah made a suicide gesture by cutting herself superficially in order to get out of CITC. When Rose learned from a staff member what Hannah had done, she grabbed her wrists painfully hard,

while they were bleeding, picked her up off the floor, slammed her down onto the bed, and held her down, all grinning maniacally. Rose then called the police and made a false report that Hannah had threatened other residents with a knife.

126. When Plaintiff **Adriana Link**'s father realized that CITC was not a safe and therapeutic environment for his daughter and advised Defendant Bowman that she would be leaving, Bowman told him "you will be the reason she kills herself."

127. The Defendants, as well as the state and national Teen Challenge organizations, continue to practice many of the abusive and neglectful methods described herein; even today they continue to promote and market their abusive and neglectful methods and practices as uniquely therapeutic and safe.

128. Plaintiffs and other residents were punished for entirely normal and typical teen behavior such as singing, chatting with one another, joking with one another and giggling.

129. Plaintiffs were all minors while they resided at CITC. A few of them stayed or returned as "mentors" after turning 18 and before they understood the emotional harm they had suffered because of the abuses they suffered during their time at CITC.

**D. Defendants Engaged in Dangerous, Unhealthy and Abusive Dietary Practices**

130. All residents of CITC, including the Plaintiffs, were forced to eat moldy, stale, wilted and outdated food, even as Defendants Dawn and Dave Rose stored and consumed vast quantities of donated fresh, frozen and pantry food at their home that was meant for CITC residents.

131. All Plaintiffs and other residents were forced to eat every bit of food on their plates at every meal, without consideration as to whether the resident was a vegan, a vegetarian, allergic to certain foods, whether the food was dangerously undercooked, moldy, spoiled, rotten,

or simply because she abhorred a certain food. Caitlyn Maguire was forced to eat mushrooms while a staff member watched her gag as she choked them down.

132. Residents with little or no kitchen experience were put in charge of meal preparation, with no supervision, such that some meals were so badly prepared they were inedible.

133. Some of the Plaintiffs and other residents were forced to continue eating even as they vomited into trash bins and buckets while seated with other girls in the dining area.

134. Whenever the Plaintiffs and other residents refused to eat all the food on their plates, the food that remained on the plate was saved by CITC staff and served to the Plaintiffs again and again until it was all consumed. One example of this punitive and dangerous approach to feeding the residents was that Defendants willfully ignore certain Plaintiffs' known food allergies, including lactose intolerance. Lactose intolerant Plaintiffs, including Emma Frederick, Roxanne Porras and Estella Jackson, were forced to drink milk at every meal, and to consume cheese and other foods with dairy ingredients. As a result, they experienced painful cramps, diarrhea and other symptoms of their lactose intolerance throughout their stay at CITC. Their need for frequent trips to the bathroom to cope with the abdominal symptoms was met with suspicion and accusations that they were bulimic and even closer supervision while emptying their bowels.

135. Plaintiff **Lauren Sanders** discovered mites or nits in her food. She was told to scoop them out and continue eating the food and was also accused of somehow putting the insects in the food herself. When she refused to eat bug-infested, rotted or spoiled food she was accused of being anorexic.

136. Weight management was unhealthy for some Plaintiffs and other residents. Some gained an unhealthy amount of weight from being forced to eat significantly more calories than

they were accustomed to. Others lost weight because of the long hours of physical labor and exercise.

137. Plaintiffs and other residents were accompanied into the bathroom by a staff member and were frequently forced to sing as they used the toilet to demonstrate to the Defendants that they were not vomiting the food they had been forced to consume.

## E. Defendants Engaged in Pervasive Forced Labor and Economic Exploitation

138. CITC required the Plaintiffs and all other residents to perform hours of daily manual labor at the facility itself, without pay.

139. CITC punished and threatened to punish Plaintiffs and other residents who did not comply with CITC's forced labor demands.

140. Forced labor performed by Plaintiffs and other residents at the CITC facility itself included, but was not limited to the following:

a. Cleaning – all the vacuuming, dusting, wiping baseboards, hand-mopping floors with rags, washing windows, cleaning toilets, cleaning an industrial stove, cleaning out refrigerators, cleaning out tampon bins;

b. Kitchen operations, including most or all food preparation and service, washing dishes and trays, cleaning, sweeping, mopping, and restocking supplies;

c. All sweeping and cleaning CITC property walkways, ramps, and the parking lot;

d. All raking, bagging, and disposing of leaves;

e. All landscaping, pulling weeds, and watering plants and grass;

f. All the cleaning of CITC transport vans and the directors' personal vehicles, including wiping down floors, windows, and surfaces;

g. Painting walls;

h. Building bunk beds at CITC;

i. Performing quality control inspections with staff, teaching residents how to perform labor, and supervising other residents;

j. All the deep cleaning to ensure the facility was "tour ready" for prospective residents or for family visits;

k. All the cleaning of dusty, dirty and moldy storage areas including the food pantry, the basement and the attic; these chores were done without access to gloves or masks, without equipment or other assistance with heavy objects – in other words, with no consideration for the girls' health and welfare.

141. CITC residents, including most of the Plaintiffs, were forced to perform hard and dangerous outdoor physical labor, even in intense heat, with few breaks for water or rest. At least one Plaintiff was made to use a large gas-powered lawn mower with no training or experience. Many of the Plaintiffs and other residents – including, for example, Kirah Oswald, **Creed Melton**, Hannah Weal and Hannah Scragg - were forced to cut the facility's lawn on hands and knees with child safety scissors, for hours on end, in all kinds of weather, and without adequate breaks or hydration. A resident with known scoliosis was forced to perform the same hard labor and physical exercise as others, with no accommodations made for her physical limitations, which caused her undue pain and suffering.

142. Not only were the Plaintiffs and other residents forced to maintain the exterior grounds of the CITC facility, but they were also forced to maintain property owned by Defendants Dawn Rose and Dave Rose, as well as friends of the Roses and Missy Bowman. This work included cleaning inside their homes, mowing the lawn, pulling weeds, raking leaves, hauling and spreading mulch, moving logs, cleaning out the Roses' barn, trimming shrubs, and using a dangerous log splitter with no training or safety gear.

143. The large barn on the Roses' property was stocked high with palettes of supplies intended for the residents at CITC, including personal hygiene and comfort items donated by local pharmacies and other businesses. Instead of sharing these items with the residents of CITC, as intended by the donors, the Roses were cruel and miserly, and allowed Plaintiffs and other

residents who had worked hard on their property to choose only a single comfort item – such as shampoo or body lotion - among thousands of provisions; this "privilege" was their only "compensation" after many hours of heavy, unpaid labor at the Rose property.

144. Plaintiffs and other residents were forced to perform the labor of preparing all meals for residents and staff. This included a strict timetable in which the meal had to be ready to serve within 30 minutes of beginning preparation, even if the food being prepared included raw meat. During the Dawn Rose regime, this work was sometimes supervised by a male" chef" who subjected the Plaintiffs to intense, physical exercise routines akin to those used by the U.S. Marine Corps.

145. Cleaning chores were closely inspected by the Defendants. If a Plaintiff or other resident neglected even a tiny area of dust or dirt, or a single strand of hair on a sink, she would be subjected to the array of unreasonable and abusive punishments described herein.

146. CITC forced Plaintiffs and other residents to perform the above-listed unpaid labor, and more, in order to earn the favor of the Defendants required for them to "graduate" and thereby leave the facility.

147. The forced unpaid labor that Plaintiffs and other residents were made to undertake was viewed by defendants as a "privilege" which Plaintiffs and others endured as a lesser of two evils when the alternative was to have little or nothing to do inside the facility itself.

148. CITC also transported Plaintiffs and other residents to churches – the names and locations of which are presently known only to the Defendants – in order to perform manual labor. Plaintiffs and other residents performed cleaning, landscaping, and general maintenance labor at several churches at the command of CITC.

149. CITC forced Plaintiffs and other residents to practice and then perform music at so-called "rallies" at churches to fundraise for CITC.

150. CITC forced Plaintiffs and other residents to give personal testimonials at rallies to fundraise for CITC. They were encouraged to lie to make their testimony more powerful.

151. CITC forced Plaintiffs and other residents to work for various outside vendors and functions such as church fundraising dinners, charitable auctions, and various church dinners, where Plaintiffs were required to work long hours setting up for and cleaning and tearing down after these functions, and also to serve as waitresses and servers, all while being forbidden to speak with anyone outside their CITC group.

152. All forced labor at CITC was involuntary for Plaintiffs and other residents.

153. CITC punished Plaintiffs and other residents whenever leaders or staff found their work unsatisfactory.

154. Plaintiffs and other residents performed the forced labor described herein for at least 4 hours every weekday and at least 6 hours each weekend day.

155. CITC forced Plaintiffs and other residents to perform labor while sick or injured. As an example, Breanna Bullis was forced to perform physical fitness routines, including running, with an injured and untreated ankle.

156. CITC would take away privileges and threaten to take away privileges from Plaintiffs and other residents who refused to work or who were deemed to have performed 'unsatisfactory' work.

157. As a result of refusing to work, or performing unsatisfactory work, Plaintiffs and other residents lost access to food, hygiene products, were placed on Talking Fast, were shamed, were reduced in "rank" to a lower level, were made to perform exercise until they were sick and exhausted, or had communication with their families restricted. Plaintiffs believed they would suffer these punishments at any time if they refused to work.

158. Plaintiffs and other residents believed they would be punished by removing privileges if they refused to work. This included food restrictions, the ability to speak, the ability to communicate with their families, and an extension of their time at CITC.

159. Plaintiffs and other residents believed they would be punished with excessive physical exercise if they refused to or performed unsatisfactory work.

160. CITC never paid Plaintiffs, other residents, or their families for the hundreds of hours of forced labor that Plaintiffs performed, while at the facility and at outside locations.

161. CITC received an economic benefit from the forced labor of Plaintiffs and other residents by replacing paid employees and reducing operational costs for: (a) custodial and maintenance services of the facility and its grounds; (b) administrative and coordination services; (c) resident supervision, scheduling, and management; (d) marketing and fundraising; and (e) quality control.

162. CITC and the individual Defendants profited from the unpaid labor of Plaintiffs and other residents, as well as the many activities the Plaintiffs and other residents were forced to participate for the purpose of collecting money and/or in-kind donations for CITC.

163. Dawn and Dave Rose, and Missy Bowman - and their family and friends whose homes and properties were maintained by Plaintiffs and other residents - personally received an economic benefit from the forced labor of Plaintiffs and other CITC residents by replacing their own labor and/or paid employees and contractors for the cleaning and groundskeeping of their private residence with the unpaid, forced labor of Plaintiffs and other residents.

164. By information and belief, Missy Bowman engaged in illicit accounting practices to reimburse herself for her personal expenses from CITC's accounts. These expenses included, by example, her home Netflix subscription, and multiple trips to Starbucks and fast-food restaurants which she falsely reported were for the CITC residents.

165. CITC disguised the labor of the Plaintiffs and other residents both as a "privilege" and as discipline that was intended to promote a positive peer culture, when in fact the labor served primarily to reduce facility operating costs by replacing paid adult staff – housekeepers, cooks, cleaning crews, maintenance crews and other contractors - with that of unpaid resident children.

166. Some Plaintiffs and other residents of CITC were also forced to clean the storage areas of a local florist, to solicit donations during town festivals, and to set up and tear down dining areas for church functions in the area. They served as custodians, wait staff and caterers. As with all of their labor, Plaintiffs were not paid for any of this work.

167. Some Sundays were spent with the Plaintiffs and other residents working at multiple churches and spending long hours in the CITC van going from town to town - beginning at 8 a.m. and ending late at night. During these long days and nights, Plaintiffs and other residents were forced to perform physical labor, and to give embarrassing and often exaggerated "testimony" to church members. Otherwise, they were forbidden to speak with or interact with church members.

168. Some of the Plaintiffs and other residents were forced to perform heavy labor at universities in Indiana and Illinois, including Butler University and Purdue University. By information and belief, these and other universities paid CITC for the girls' labor with an understanding that wages would be passed along to or shared with the girls. Instead, they received no pay whatsoever for this heavy labor, which included 12-hour workdays. On some occasions their job duty was to build or tear down heavy student bunks. On other occasions the Plaintiffs and other residents were made to assist the university students with moving their heavy personal items into or out of dormitories.

169. Some of the Plaintiffs and other residents, including **Adriana Link**, were forced to perform long hours of labor at an Edible Arrangements store, particularly during the busiest holidays of the year. By information and belief, Edible Arrangements paid CITC for the girls' labor. The girls received no pay whatsoever for this labor.

170. Some of the Plaintiffs and other residents were forced to work at CITC-sponsored car washes in order to solicit donations for CITC. The girls were made to work long hours, sometimes in extreme heat, with no access to shade, little rest and inadequate hydration. They were never paid for this work.

171. Some of the Plaintiffs and other residents were forced to work at CITC's on-site coffee truck. As with all other labor, the girls were sometimes made to work long hours and were never paid for this work. Caitlyn Maguire was forced to work in the coffee truck full-time, six days per week. When she used the truck's iPad to contact someone to get her out of CITC on her 18th birthday she was fired.

172. Upon information and belief, Defendants Dawn Rose and Missy Bowman told some of the Plaintiffs that they would be paid for their labor in the form of deposits into their CITC accounts for the girls' use when they left CITC. But in no case did any of the Plaintiffs receive such monies.

**F. Defendants Failure to Provide Safe Living Conditions, including an inability to receive Necessary Medical and Dental Care and Mental Health Treatment**

173. Some Plaintiffs' parents were promised that CITC offered regular access to physicians, including psychiatrists, as well as licensed therapists. Except for the short tenure of several licensed therapists, CITC had no physicians or qualified mental health providers on staff or available to the Plaintiffs and other residents. By information and belief, few if any CITC staff were trauma-informed or trained.

174. The Defendants denied Plaintiffs and other residents necessary medical and dental attention. Instead, they were told they were faking or exaggerating their illnesses. As an example, Plaintiff Roxanne Porras arrived at CITC with anemia and was taking iron supplements. Defendant Bowman – without consulting a physician or advising Ms. Porras' parents - refused to allow Roxanne to take the iron supplements, worsening the anemia.

175. Plaintiff **Lauren Sanders** was not taken to the hospital despite severe and painful constipation lasting 21 days. This same child was repeatedly denied medical care for a yeast infection until a sympathetic staff member took her to a physician. She was also forced to work outside in the sun for many hours, while taking the prescription antibiotic doxycycline. Despite knowing this child was taking doxycycline, and despite the child reminding Bowman and staff that the drug would cause significant sunburn, she was forced to work in the hot sun with no protection for many hours. As anticipated, she sustained painful sunburns from the exposure, including blisters on her shoulders, nose and feet.

176. Some of the Plaintiffs and other residents were taken off their prescription medications "cold turkey" without CITC advising the parents or consulting with physicians for safe withdrawal. When Plaintiffs and others who were taken off their prescription medications displayed withdrawal symptoms, Defendants did not consult with physicians, seek any medical care whatsoever, notify parents or re-start medications.

177. Leaders and staff at CITC are entirely unqualified to house and treat the types of mental challenges their residents face. As an example, Plaintiff Kaysie Peyton attempted to commit suicide by cutting herself. Defendant Missy Bowman sought no treatment for the cut or the attempted suicide and Kaysie was left with a permanent scar. Instead of seeking proper medical and mental health care, Bowman merely mocked Kaysie for her attempted suicide, even though Bowman had taken her off her prescription anti-depressants cold turkey.

178. Plaintiffs were denied emergency medical care. For example, Aubree Davis overdosed on approximately 20 doses of Dramamine and became seriously ill. When she asked to go to the hospital Defendant Bowman merely laughed at her and told her to lie down. Aubree was severely ill from the Dramamine and remained bedridden for three days.

179. Defendant Dawn Rose took Plaintiff Laural Whitehouse off her antidepressant medications cold turkey, and without consulting either her parents or a physician. This sudden withdrawal resulted in Laurel experiencing significant emotional pain and suffering.

180. Plaintiff Delia Simon tried to commit suicide by hanging herself. Defendant Missy Bowman refused to take Delia for medical or psychiatric care despite being aware of this suicide attempt.

181. Plaintiff Isabela Jacquez was left unprotected from a fellow resident who was known to be violent, who then assaulted her. Isabela was so terrified she, too would be punished, that she did not fight back or otherwise protect herself during the assault.

182. CITC revealed confidential, embarrassing or sensitive information about its residents, including the Plaintiffs, to the Plaintiffs' family members for the purpose of isolating, humiliating and estranging Plaintiffs and other residents from their family members.

183. Dawn Rose, Missy Bowman and some staff deliberately weakened the relationships between Plaintiffs and other residents and their family members by falsely telling residents their family members were angry and would not speak with them, and/or falsely telling the family members that the residents were angry and would not speak with them. This manipulation caused Plaintiffs and their loved ones' emotional distress and contributed to their estrangement.

184. Residents who reported unsafe conditions were often punished for reporting. For example, Aubree Davis reported her roommate had a knife, and she was afraid to go to sleep. In response, Aubree had her phone calls taken away for a month.

185. Defendant Dawn Rose revealed to a Plaintiff the fact that this girl's mother was undergoing a mastectomy for breast cancer, even though the girl's mother had shared the information with Dawn confidentially in order to postpone her daughter's visit home while she was hospitalized and specifically instructed Dawn not to share this information with her daughter. This cruel and unnecessary revelation caused this child – and her mother - profound grief, anxiety and emotional distress.[4]

186. Punishments were sometimes handed out deliberately just before Plaintiffs and other residents were scheduled to leave CITC for family visits or important life events, so that the visit would be cancelled, causing Plaintiffs and their family members grief and emotional distress.

187. Plaintiff Breanna Wombaker was placed in grave danger at the hands of her fellow residents when they were falsely told that Breanna was homicidal, that she had attacked a young boy, and that she might kill them in their sleep. Defendant Bowman advised the residents and other staff that Wombaker was possessed by demons. As a result of Bowman's lies, other residents shunned Breanna, and several threatened to harm or kill her, leaving her terrified and paranoid of her fellow CITC residents.

188. CITC did not treat supposed "counseling" sessions between Plaintiffs and other residents and staff who were serving as therapists with any degree of confidentiality, and Defendants often purposefully revealed private information from these sessions to Plaintiffs'

[4] The identity of this Plaintiff will be revealed to defense counsel confidentially.

family members and fellow residents, causing humiliation, shame, embarrassment and other emotional distress.

189. Dawn Rose showed favoritism toward some Plaintiffs and other residents whose parents paid higher fees and/or provided additional monies and/or in-kind donations. Plaintiffs and other residents whose parents were less well-off, or who resided at CITC by court-order, were treated more harshly. This favoritism was one example of how CITC bred resentment among its residents, worsened the living environment, coerced compliance with their rules, and caused emotional injuries.

190. Some of the Plaintiffs and other residents were forced to wear ill-fitting uniforms. As an example, the khaki pants Caitlyn Maguire were painfully small and left marks on her abdomen.

191. The Defendants were miserly with hygiene products, despite the abundance of supplies that were stored and not shared with residents. For example, shower products were portioned into small condiment cups at scheduled shower time, and residents were made to wait in line while staff squeezed small quantities of toothpaste onto their toothbrushes.

192. The individual Defendants housed a number of cats at CITC, despite knowing that some of the Plaintiffs and other residents suffered from cat allergies. Some of the Plaintiffs and other residents who were allergic to the house cats were forced to spend their entire stay at CITC with congestion, eye irritation, coughing and other allergy symptoms because they were denied access to necessary allergy medication to relieve their symptoms.

193. During some of the Plaintiffs' stays at CITC, mold was growing on the ceilings and walls, and water was dripping into living areas because of leaks in the roof that went unfixed. During **Lauren Sanders**' 2025 stay at CITC, beds were broken, and water was regularly coming through the ceilings, which appeared in some areas to be close to collapse.

194. CITC's conduct created a highly fearful environment of regular conflict with no trust between residents. CITC forced Plaintiffs to live in this environment for months or years, which left them in a state of persistent hypervigilance, fear, and isolation. CITC fostered this state of mind and manipulated the Plaintiffs to ensure their continuing compliance and enrollment.

195. CITC staff told residents, including Plaintiffs, that their mental challenges were simply a failed connection to God and were ultimately demonic. No matter how serious the Plaintiffs' mental health symptoms the Defendants refused to take Plaintiffs and other residents to hospitals or call for an ambulance to come to CITC.

196. By information and belief, Dawn Rose, Missy Bowman and their staff had no formal training in how to manage teens in their care, some of whom had obvious mental health and addiction issues, or how to keep the teens in their care safe during emotional crises. Instead, Dawn Rose, Missy Bowman and their staff would often call 911 to have a Lebanon police officer assist them by physically restraining a Plaintiff or other resident, forcing a Plaintiff or other resident into isolation, or otherwise "assisting" CITC by the use of force, threats and intimidation.

197. Plaintiff Joanna Flood arrived at CITC with a painful neck injury from a recent auto accident and a doctor's orders to rest her neck. CITC offered her no treatment for the neck injury, and she was forced to perform all physical labor and physical exercise as the other residents, which greatly worsened her pain and lengthened her recovery.

198. Plaintiff Rachel Simonick was forced to sleep on the carpeted floor while in isolation, with no bedding to keep her skin off the floor. She developed a fungal infection and severe rash on her face and jawline. Dawn Rose refused to take Rachel to a physician for the infection, or to otherwise provide proper medical care. The infection worsened and has left Rachel with permanent facial scarring.

199. Plaintiff Sarah Taylor broke her toe while working to build loft beds at a state university. She reported the fracture to CITC, but Defendant Bowman refused to take her to a physician. As a result, Sarah developed repeated infections in the toe which is now permanently numb and disfigured.

200. Plaintiff Sarah Taylor also had a painful pilonidal cyst which she reported to Bowman. She was refused medical care for this painful and debilitating infection.

201. Plaintiff Emily Courtney was denied her medication for migraine headaches and painful period cramps.

202. Plaintiff Christine Hong complained repeatedly about an ear infection that continued to worsen and cause considerable pain over the course of several months. She attempted to tell her mother about the ear infection, but CITC had cut off all Hong's communication with her mother. Dawn Rose ignored Christine's pleas for medical care until the ear drum ruptured and she finally took her to a local emergency room just before a planned Christmas visit home. The long wait caused complications which required a visit to a physician in her home state of Ohio.

203. During Missy Bowman's regime some of the Plaintiffs and other residents were forced to wear the kinds of ankle monitors that police use to track criminals. The placement, inspections and management of these ankle monitors were inadequate, such that the monitors would cut into the flesh of some of the girls. Residents who had run away or were perceived as flight risks were also required to wear orange jumpsuits. Plaintiff Estella Jackson ran away to escape the abusive conditions at CITC, was caught and was then forced to wear an orange jumpsuit and ankle monitor.

204. Plaintiff **Creed Melton** similarly decided to run away after being at CITC for only two days. She was so terrified she ran to the home of an older woman who lived nearby,

called her mother and begged to go home. A police officer picked her up and told her he was required to return her to CITC. She was then placed in isolation in the "safe room" where – like other girls – she was forced to sleep on a floor with no pillow or blanket, and infrequent access to a bathroom. She was also made to wear an orange jumpsuit, which went unwashed for two weeks.

205. CITC regularly denied Plaintiffs and other residents the "right" to use the bathroom. As an example, Plaintiff **Adriana Link** suffered from repeated urinary tract infections and urinary accidents from not being allowed to use the bathroom when needed. Another resident fled to a nearby park to use the restroom and then called 911. The police returned her to CITC and told staff they needed to let her use the bathroom.

206. When residents reported threats to their health and safety they were punished or ignored. As an example, when Plaintiff Kristin Williams reported to Defendant Dawn Rose that she was the victim of a sexual assault Rose quickly dismissed her report and accused her of lying.

207. Plaintiff Eliana Greenfield was forced to participate in long runs and other outdoor exercise without her asthma inhaler.

208. Residents were routinely required to continue participating in grueling physical activities, including long runs, even while ill or injured. Plaintiff **Creed Melton** was forced to participate in long runs even while ill with a fever.

209. Some Plaintiffs required emergency psychiatric care upon leaving CITC.[5]

210. Many of the Plaintiffs and other residents came to CITC with broken or fragile relationships with their parents and other family members. Instead of working with them, and their families, to strengthen ties or re-build trust, the Defendants engaged in manipulations and

[5] Mental health records detailing Plaintiffs' psychiatric care will be provided to defense counsel.

lies that further weakened family ties. Some Plaintiffs and other residents became permanently estranged from their families due at least in part to the Defendants' abusive tactics and poor mental health care.

### G. Defendants Engaged in Frightening, Bizarre and Non-therapeutic Religious Practices and Rituals in an Effort to Change Residents' Behaviors

211. The Defendants repeatedly told the Plaintiffs and other residents that their psychiatric symptoms were their own faults because they were not working hard enough to "hear God" or "accept God into their hearts."

212. Religious rituals were a regular part of life at CITC for the Plaintiffs and other residents. At times these rituals were confusing, frightening and bizarre. As an example, Defendant Missy Bowman and a staff member taking Plaintiff E.A.- then only 12 or 13 years old - to what E.A. recalls was a Catholic church in another town. This happened late at night; E.A., Bowman and the employee were met by a priest who conducted something akin to an exorcism on E.A. by forcing her to kneel in the aisle of the church, then forcefully and repeatedly dunking her head into two buckets of water while reciting prayers or incantations. E.A. was told by the Defendant Dawn Rose that this ritual was designed to rid her of a "demon" or "demons" she was told had caused her to misbehave. Instead, the violent assault terrified and confused her, caused her to cough and choke, to vomit, and left visible bruises on her neck. Her emotional trauma from this horrific incident is likely permanent.

213. Plaintiff Hannah Combs was taken outside the facility late at night by Defendant Dawn Rose to an unknown church, where she was met by adults – strangers to her – who were wearing robes, speaking in tongues, and performing what Hannah understood was a religious ritual designed to draw the "demons" out of her. She, too, has been left with long-term emotional trauma from this event.

214. Other residents, including Plaintiffs Madeline Lewis and Breanna Wombaker, were also told they were possessed by demons. Breanna remembers what was termed a "deliverance" ritual in which multiple staff members prayed over her, spoke in tongues, and expected to see physical manifestations from Breanna - including convulsions - that would confirm her "deliverance." During this ritual Breanna suffered from a panic attack while another resident lay beside her writhing in convulsions.

215. Most Plaintiffs and other residents were subjected to individual prayer encounters where staff and other residents encircled them, prayed and spoke in tongues to bring the "demons" out of these girls.

216. Access to "worldly" or secular music, movies, television, books, magazine and other materials was strictly forbidden. Only a limited number of overtly religious materials and music were accessible to the Plaintiffs, along with a handful of children's movies.

217. Plaintiffs and other residents were punished for vague conceptual violations like bad body language or perceived "ungodly" behavior. For example, Plaintiff Autumn Mays received a write-up stating "Character quality needs to be improved on" because Autumn was sitting on her bed with her door open. Plaintiff Madison Music got a write-up for putting in her contact lenses before a forced run.

218. A common type of supposed "ungodly" behavior or moral aberration was to be gay or perceived as gay, or otherwise LGTBQIA+. Any such hint or accusation inspired the Defendants to punish, isolate and otherwise abuse certain Plaintiffs and other residents. Plaintiff Emily DuPuis, as an example, was locked in the "safe room" for an anti-gay prayer session. Plaintiff Caitlyn Maguire was repeatedly shamed and disciplined for being a lesbian, even though she was not a member of the LGTBQIA+ community.

219. Dawn Rose would report to close family members of residents, including Plaintiff Autumn Mays, that the resident was gay, which was just one example of a communication with family that was specifically designed to cause a rift between a resident and her family. Rose's report to Autumn's grandmother was unnecessary, cruel, had no therapeutic purpose, and was very upsetting to both Autumn and her grandmother.

220. The Defendants' homophobia was so pronounced that girls who were "caught" hugging one another - even when doing so merely to comfort other residents who were crying or frightened - were accused of being gay. Even these accusations resulted in some of the Plaintiffs and other residents being subjected to discipline and/or prayer sessions as "conversion therapy."

### H. Defendants Failed to Inform Plaintiffs or Their Parents That CITC Was Not an Accredited High School Offering a Valid Diploma

221. At no time did Defendants Dawn Rose or Dave Rose advise Plaintiffs and their families that CITC was not an accredited high school, or that it could not offer the residents a legitimate high school diploma that would be recognized by most colleges and universities.

222. As a result of the Roses' fraudulent concealment regarding accreditation, Plaintiffs and other residents during Dawn Rose's regime fell significantly behind in their high school education, which eventually forced them to choose to return to a post-secondary school for another year or more, or forgo a high school diploma and seek a GED.

223. The inadequate education the Plaintiffs and other residents received at CITC during the Dawn Rose regime resulted in all of them being less prepared to take high school equivalency courses after leaving CITC.

224. The "credits" the Plaintiffs and other residents received at CITC during the Dawn Rose regime were not transferrable to any state-accredited post-secondary school.

225. The curriculum that CITC offered to many of the Plaintiffs and other residents – particularly during the Dawn Rose regime - was not geared to high school students. The Defendants hired no accredited teachers, offered no classroom lectures and no high-school level science or math, provided no access to the internet to conduct research, and maintained no proper educational library; instead, the "curriculum" was simplistic, faith-based and largely limited to elementary-level paper workbooks. Plaintiffs and other residents were never taken on educational outings – no museums, no libraries, no historical tours or other educational field trips.

226. During Missy Bowman's regime the curriculum changed somewhat to include on-line coursework through Lebanon High School and other legitimate on-line education programs. However, Plaintiffs and other residents were prohibited from working with the high school tutor or doing their coursework while engaged in long hours of labor, or while being punished. Many students, included Caitlyn Maguire, needed help with schoolwork to maintain the required "B" average to graduate, but there were no teachers at CITC to help.

227. Forced labor made up the majority of the Plaintiffs' waking time at CITC. School work was perfunctory, simplistic, limited to biblical lessons, and almost entirely self-taught, particularly during Dawn Rose's regime. Instead of classroom lectures or on-line tutorials intended for high school students, these Plaintiffs were expected to complete faith-based workbooks intended for elementary grade students to earn "credit" for their schoolwork. There were no licensed teachers present to provide daily school instruction. A tutor from nearby Lebanon High School briefly taught weekly classes during Missy Bowman's regime but left for reasons unknown to Plaintiffs but known to Bowman.

228. Even the Plaintiffs who ultimately "graduated" from CITC, particularly during the Dawn Rose regime, discovered that they did not have a valid diploma, and that the "schoolwork" they did while at CITC was not accredited by any known post-secondary

institution. As a result, these Plaintiffs found when they left CITC that they were significantly behind their peers in their education and could not expect to attend college anytime soon. In fact, a GED was their most viable option for most of these Plaintiffs, a revelation that was shocking and traumatic.

229. Plaintiff Caitlyn Maguire graduated from CITC, but the Defendants refused to provide her with her diploma or let her "walk" during the graduation ceremony. When she asked them to mail her diploma to her she was instead told she must drive to Lebanon from Illinois to pick it up in person.

230. The Defendants chose to provide only the most meager and rudimentary education even though they knew that when many of the girls, including some Plaintiffs, when they were finally able to leave CITC they would likely be homeless, and would not be able to attend school while also working one or more jobs to support themselves.

231. During all relevant times, the Defendants prioritized religious worship, cleaning, forced labor,  and other chores over educational study and achievement. At no time did CITC employ full-time licensed teachers to assist the Plaintiffs and other residents in obtaining a high school diploma.

## I. Specific Harms to Plaintiffs

232. Plaintiffs have suffered injuries as a direct and proximate result of the Defendants' abuse, neglect, indoctrination, coercion, intimidation and other wrongful practices the Plaintiffs experienced first-hand. Secondly, they have suffered the injuries set forth below from witnessing the regular abuse and coercion their housemates endured. Thirdly, they have suffered injuries set forth below from the fear, confusion and anxiety of interacting with residents with severe psychiatric disorders. Finally, they have suffered injuries set forth below as a result

of their own forced complicity in the discipline and suffering of their fellow residents. These injuries include but are not limited to:

a. Severe psychological distress;

b. Delayed academic progress;

c. Shame and guilt;

d. Lost wages and economic exploitation from performing hundreds of hours of unpaid forced labor.

e. Loss of trust of therapeutic institutions;

f. Post-Traumatic Stress Disorder, severe anxiety and social agoraphobias;

g. Permanent disability from psychiatric and psychological conditions that their experiences at CITC either caused or worsened;

h. Loss of faith and connection to God, their families, and their prior church communities;

i. Persistent sleep disturbances;

j. Struggles with appropriate boundaries and healthy relationships with friends and romantic partners due to extensive absence of healthy interactions with peers;

k. Difficulty forming and maintaining healthy relationships; and

l. Emotional trauma triggered by routine experiences and encounters that remind them of CITC.

## VI. CAUSES OF ACTION

## COUNT ONE

### Violations of TVPRA 18 U.S.C. §§ 1595 and 1584 - Against All Defendants

233. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

234. The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiffs against "the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving

anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [any section of 18 U.S.C. §§ 1581, et seq.]"

235. Plaintiffs were victims of forced labor trafficking in violation of 18 U.S.C. § 1584.

236. Under 18 U.S.C. § 1584, it is unlawful to knowingly and willfully hold another person to involuntary servitude.

237. Defendants knowingly and willfully held Plaintiffs in involuntary servitude in several ways, including but not limited to the following:

a. Creating and maintaining a system wherein Plaintiffs and all other residents were forced to work against their will;

b. Requiring Plaintiffs and other trafficking victims to work excessive hours every day or nearly every day;

c. Retaining the financial proceeds from Plaintiffs' labor and that of other trafficking victims while providing them with no salary, wages or compensation at any time;

d. Maintaining complete control over Plaintiffs and other survivors throughout the labor arrangement, dictating when, where, and for how long they would work, and under what conditions;

e. Maintaining complete control over Plaintiffs' and other survivors' living conditions, food, hygiene, and communications with family and expressly conditioning access to all of it on compliance with forced labor demands.

238. Defendants received financial benefit from the forced labor of Plaintiffs and other survivors in violation of 18 U.S.C. § 1584.

239. Defendants saved money by using unpaid labor to maintain CITC.

240. Defendants made money by requiring Plaintiffs to perform unpaid labor at various outside ventures and often forcing Plaintiffs to give testimonials in a scheme to raise money or in-kind donations for CITC.

241. Plaintiffs suffered damages as a result of Defendants' reckless and coercive conduct.

242. Defendants received financial benefits from running a business that recruited, exploited, and manipulated children from desperate families and held them in involuntary servitude under the guise of helping the children with their purported mental health struggles.

243. Plaintiffs are entitled to compensatory and punitive damages, restitution, attorneys' fees, costs, and any other relief deemed appropriate.

## COUNT TWO

### Violations of TVPRA 18 U.S.C. §§ 1595 and 1589 - Against All Defendants

244. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

245. The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiffs against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [any section of 18 U.S.C. §§ 1581, et seq.]".

246. Plaintiffs were victims of forced labor through threats of harm in violation of 18 U.S.C. § 1589.

247. Under 18 U.S.C. § 1589(a), it is unlawful to knowingly provide or obtain labor or services by means of: (1) force, threats of force, physical restraint, or threats of physical restraint; (2) serious harm or threats of serious harm; (3) abuse or threatened abuse of law or legal process; or (4) any scheme, plan, or pattern intended to cause a person to believe that they would suffer serious harm or physical restraint if they did not perform such labor or services.

248. Under 18 U.S.C. § 1589(b), it is also unlawful to "knowingly benefit, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services" by the means described in subsection (a).

249. Under 18 U.S.C. § 1589(c)(2) the term "serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, reputational harm…"

250. Defendants violated 18 U.S.C. § 1589 because they obtained Plaintiffs' and other survivors' labor through extreme emotional abuse, serious harm in the way of malnutrition, deprivation, isolation, "talking fasts," psychological harm, physical harm, force, medical neglect, and threats of serious harm.

251. Defendants further violated 18 U.S.C. § 1589 by employing a systematic discipline system as a scheme to cause Plaintiffs and other survivors to rightly believe they would be subjected to serious harm if they refused to work. Defendants violated 18 U.S.C. § 1589 in several ways, including but not limited to the following:

a. Implementing, and maintaining a systematic discipline process that used physical and psychological abuse and threats of physical and psychological abuse to coerce and obtain compliance for forced labor;

b. Threatening to restrict and restricting Plaintiffs' access to food, water, hygiene products and housing if they did not comply;

c. Threatening to restrict and restricting Plaintiffs' access to communication with family if they did not comply;

d. Physically harming students who tried to run or resist in front of Plaintiffs and other survivors;

e. Threatening Plaintiffs with discipline, and giving out discipline, that included forced labor, forced exercise, isolation, "talking fasts," and other physical and psychological punishment if they did not perform unpaid labor;

f. Shaming residents who did not comply in front of Plaintiffs as a threat to Plaintiffs;

g. Shaming Plaintiffs when they did not comply;

h. Restricting and monitoring Plaintiffs' contact with family members to ensure continuing compliance with forced labor and the steady flow of tuition payments;

i. Threatening to restrict and restricting Plaintiffs' ability to speak if they did not comply; and

j. Threatening to lengthen the Plaintiffs' time at CITC, and convincing parents to allow for and fund Plaintiffs' lengthened stays at CITC.

252. Defendants profited financially through these violations, and, as such, are liable under 18 U.S.C. §§ 1589(b), 1595(a).

253. Defendants knowingly received financial benefit from their violations of the TVPRA by receiving unpaid labor and services that benefited the Defendants.

254. Defendants saved money by using unpaid labor to maintain CITC and the individual Defendants' homes and properties.

255. Plaintiffs suffered damages as a result of Defendants' conduct.

256. Defendants received financial benefit from running a business that recruited, exploited, and manipulated children from desperate families and obtained the children's labor through serious harm and threats of serious harm under the guise of helping the children with their purported mental health struggles.

257. Plaintiffs are entitled to compensatory and punitive damages, restitution, attorneys' fees, costs, and any other relief deemed appropriate.

## COUNT THREE

**Violations of TVPRA 18 U.S.C. §§ 1595 and 1590 - Against All Defendants**

258. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

259. The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiffs against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, et seq.

260. Defendants benefited from a venture in which Plaintiffs were recruited, transported, and housed for forced labor in violation of 18 U.S.C. § 1590.

261. Under 18 U.S.C. § 1590(a), it is unlawful to "knowingly recruit, harbor, transport, provide, or obtain by any means, any person for labor or services in violation of this chapter."

262. Defendants violated 18 U.S.C. § 1590 in several ways, including but not limited to the following:

a. Creating and disseminating misleading marketing materials that advertised CITC as offering legitimate and uniquely therapeutic services to recruit Plaintiffs and other survivors;

b. Misrepresenting that discipline would be therapeutic and that labor would be voluntary;

c. Specifically targeting vulnerable children and their desperate families;

d. Housing the Plaintiffs and other survivors at all relevant times during which all violations occurred;

e. Conditioning Plaintiffs' housing, education and welfare on compliance with forced labor demands;

f. Controlling all aspects of Plaintiffs' communication with the outside world and editing letters to remove any negative mention of CITC or the forced labor;

g. Coercing Plaintiffs and other survivors to provide labor through comprehensive physical, psychological, and spiritual means;

h. Monitoring and controlling Plaintiffs' and other survivors' behavior during forced labor to ensure continued compliance;

i. Transporting Plaintiffs to churches, universities, for-profit businesses and other outside ventures to perform forced unpaid labor and forced unpaid fundraising activities.

263. Defendants knowingly received financial benefit from their violations of the TVPRA by receiving unpaid labor and services that benefited Defendants.

264. Defendants saved money by using unpaid labor to maintain CITC.

265. Defendants saved money by using unpaid labor to fundraise for CITC.

266. Plaintiffs suffered damages as described herein as a result of Defendants' conduct.

267. Defendants received financial benefit from running businesses that recruited, exploited, and manipulated children from desperate families and forced those children into unpaid labor under the guise of helping the children with their purported mental health struggles.

268. Plaintiffs are entitled to compensatory and punitive damages, restitution, attorneys' fees, costs, and any other relief deemed appropriate.

## COUNT FOUR

### Attempted Violations and Conspiracy to Commit Violations of TVPRA 18 U.S.C. §§ 1584, 1589, 1590, 1594, and 1595 – Against All Defendants

269. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

270. While, as alleged above, Defendants violated 18 U.S.C. §§ 1584, 1589, and 1590, in the alternative, Defendants are liable because they attempted to and did conspire to violate 18 U.S.C. §§ 1584, 1589, and 1590.

271. The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiffs against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from

participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, et seq.

272. Under 18 U.S.C. § 1594(a)(b) whoever attempts or conspires to violate §§ 1584, 1589, or 1590 shall be punished in the same manner as a completed violation of each section.

273. Defendants intended to violate, took the necessary steps to violate, and conspired to violate 18 U.S.C. §§ 1584, 1589, and 1590, as more fully alleged herein.

274. Plaintiffs suffered damages as described herein as a result of Defendant's conduct.

275. Plaintiffs are entitled to compensatory and punitive damages, restitution, attorneys' fees, costs, and any other relief deemed appropriate.

**COUNT FIVE**

**Negligence and Gross Negligence under Indiana Law - Against CITC and Missy Bowman**

**Plaintiffs Included in Count Five: Kate Adams obo E.A., Azarriah Gibson, Madeline Lewis, Adriana Link, Emily Nelson and Lauren Sanders**

276. Plaintiffs incorporate each of the preceding paragraphs as if they were fully set forth herein.

277. Defendants Missy Bowman and other staff owed a legal duty to these Plaintiffs to provide a safe, healthy and stable living environment free from harassment, intimidation, bullying, threats, manipulation, lying, isolation and other abuses set forth in detail above.

278. Defendants owed a duty of reasonable supervision over its staff and these Plaintiffs for the safety and welfare of these Plaintiffs.

279. It was reasonably foreseeable by these Defendants that these Plaintiffs would be physically, emotionally and spiritually harmed by the negligence and gross negligence of these Defendants.

280. At all relevant times, Defendants Bowman and CITC were negligent in their care and treatment of these Plaintiffs.

281. In the alternative, the Defendants' conduct was not merely careless but was reckless and an extreme departure from reasonable care of these Plaintiffs.

282. As a direct and proximate result of Defendants' negligence, Plaintiffs E.A., Gibson and Lewis have suffered physical and emotional injuries, as set forth in Section IV above and elsewhere in this Amended Complaint.

283. In the alternative, as a direct and proximate result of Defendants' conscious, voluntary acts and omissions and reckless disregard for the duties owed toward these Plaintiffs, they have suffered physical and emotional injuries, as set forth in Section IV above and elsewhere in this Amended Complaint.

## COUNT SIX

### ***Respondeat Superior*/Civil Liability under Indiana Law - Against CITC**

**Plaintiffs Included in Count Six: Kate Adams obo E.A.,<br>Azarriah Gibson, Madeline Lewis, Adriana Link,<br>Emily Nelson and Lauren Sanders**

284. Plaintiffs incorporate each of the preceding paragraphs as if they were fully set forth herein.

285. At all relevant times, Defendant Missy Bowman and her staff at CITC were agents or employees of CITC and were acting within the scope of their employment with CITC at all relevant times and in all locations where the wrongs set forth in this Amended Complaint were committed.

286. CITC employed Missy Bowman, as well as other paid staff, to provide residential care and services to Plaintiffs E.A., Gibson and Lewis. CITC had the right, duty and obligation to control the practices and conduct of Bowman and other staff, as well as the manner of the work they performed.

287. CITC is vicariously liable for the wrongs committed against Plaintiffs E.A., Gibson, Lewis, **Link, Nelson and Sanders** by Bowman and other employees of CITC under the doctrine of respondeat superior.

288. CITC is vicariously liable for the negligent, grossly negligent, reckless and deliberate acts and omissions committed by Bowman and other paid staff, as set forth throughout this Amended Complaint, which wrongs occurred during the course and scope of their employment at CITC.

289. As a direct and proximate result of CITC's negligence, gross negligence and reckless conduct, these Plaintiffs have suffered, and will continue to suffer, mental anguish, loss of enjoyment of life, counseling expenses, shame, fear, humiliation, guilt, and other past, present and future damages.

## COUNT SEVEN

### Physical Battery under Indiana Law: Against Missy Bowman

### Plaintiffs Included in Count Seven: Kate Adams obo E.A., Azarriah Gibson and Madeline Lewis

290. Plaintiffs Adams, Gibson and Lewis incorporate by reference the preceding paragraphs of the First Amended Complaint as if fully set forth herein.

291. Defendant Missy Bowman's physical contacts with E.A., Gibson and Lewis were offensive, harmful and unconsented.

292. Defendant Bowman intended to cause harmful or offensive contacts with Plaintiffs E.A., Gibson and Lewis.

293. As a direct and proximate result of the Defendants' acts of physical battery, Plaintiffs E.A., Gibson and Lewis suffered physical injuries and emotional pain.

## COUNT EIGHT

### Assault under Indiana Law - Against CITC and Missy Bowman

**Plaintiffs Included in Count Eight: Kate Adams obo E.A.,
Azarriah Gibson, Madeline Lewis, Adriana Link,
Emily Nelson and Lauren Sanders**

294. Plaintiffs incorporate by reference the preceding paragraphs of the First Amended Complaint as if fully set forth herein.

295. Actions and threats by Defendant Missy Bowman and CITC staff placed these Plaintiffs in reasonable apprehension of immediate bodily harm.

296. As a direct and proximate result of Defendants' assaults, Plaintiffs E.A., Gibson, Lewis, **Link, Nelson, and Sanders** have suffered and continue to suffer extreme fear, mental anguish and emotional distress.

## COUNT NINE

### False Imprisonment under Indiana Law - Against CITC and Missy Bowman

**Plaintiffs Included in Count Nine: Kate Adams obo E.A.,
Azarriah Gibson, Madeline Lewis, Adriana Link,
Emily Nelson and Lauren Sanders**

297. Plaintiffs incorporate by reference the preceding paragraphs of the First Amended Complaint as if fully set forth herein.

298. Plaintiffs E.A., Gibson and Lewis were unlawfully restrained by defendants CITC and Missy Bowman.

299. CITC and Missy Bowman restrained these Plaintiffs' freedom of locomotion and/or liberty.

300. CITC and Missy Bowman restrained these Plaintiffs without their consent.

301. The false imprisonment of these Plaintiffs was done by words, acts, physical force, and/or through intimidation or asserted authority.

302. As a result of their false imprisonment, Plaintiffs E.A., Gibson and Lewis have suffered and continue to suffer extreme fear, mental anguish and emotional distress.

## COUNT TEN

**Tort of Outrage and Intentional Infliction of Emotional Distress Under Indiana Law – Against CITC and Missy Bowman**

**Plaintiffs Included in Count Ten: Kate Adams obo E.A., Azarriah Gibson, Madeline Lewis, Adriana Link, Emily Nelson and Lauren Sanders**

303. Plaintiffs incorporate by reference the preceding paragraphs of the First Amended Complaint as if fully set forth herein.

304. Defendants Missy Bowman and others at CITC engaged in behavior so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency in their treatment of Plaintiffs E.A., Gibson, Lewis, **Link, Nelson and Sanders.**

305. Defendants Bowman and others at CITC intentionally set out to cause emotional harm, and/or acted with such reckless disregard for the consequences of their actions that they clearly did not have any reasonable concern for care, health, safety the well-being of these Plaintiffs.

306. As a result of these outrageous and intentional acts causing emotional distress, these Plaintiffs suffered severe and profound physical and emotional harm which has disrupted

their daily life and functioning, including but not limited to nightmares, panic attacks, anxiety, ongoing depression and insomnia.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A. Statutory damages of at least $150,000 per violation, and attorney fees, pursuant to 18 U.S.C. § 2255 for Plaintiffs who were minors at the time of the violations.

B. That the Court enters judgment against Defendants for all general and compensatory damages allowable to Plaintiffs;

C. That the Court enters judgment against Defendants for all special damages allowable to Plaintiffs;

D. That Plaintiffs recover all possible damages for Plaintiffs' injuries and pain and suffering, including punitive damages as applicable;

E. That the Court enters judgment against Defendants for all other relief sought by Plaintiffs under this Complaint;

F. That the court award reasonable legal fees to Plaintiffs' counsel;

G. That the court order the costs of this action be paid by Defendants; and

H. That the Court grant Plaintiffs such further relief which the court deems just and proper.

## VIII. JURY TRIAL

Plaintiffs respectfully demand a jury trial on all issues.

Dated: September 17, 2026

Respectfully submitted,

**COHENMALAD, LLP**

*/s/ Gregory Laker*

Gregory L. Laker, Attorney #10322-49
Andrea R. Simmons, Attorney #11622-49
Molly K. McMath, Attorney #38954-49
One Indiana Square, Ste. 1400
Indianapolis, IN 46204
Ph: (317) 636-6481 Fax: (317) 636-2593
glaker@cohenmalad.com
asimmons@cohenmalad.com
mmcmath@cohenmalad.com

*Attorneys for Plaintiffs*